For the Appellant, Mr. Peters, and for the Appellee, Mr. Wilding, you may proceed. May it please the Court, Counsel, I am pleased to have the honor to be here after many, many years in state litigation concerning this very issue. The resolution of this case, not only do you end the three cases involved in here, or at least decide whether there is a duty, but also much of the litigation currently filed and anticipated in Plain County, Illinois. We are here as a transporter of asbestos products in this asbestos plant located in Bloomington, Illinois. The allegations are that we took a product from someone who wanted to give it to somebody, somebody who wanted it, and all we did was act as the transporter between those two points. In this case, the way transportation works, the product is transported in boxcars. These boxcars are sealed. They leave sealed from the originator. They show up at the consignee sealed. When they contact us, we come back and pick up the empty and leave. Here, plaintiffs don't argue any kind of liability for anything leading up to the delivery of the car, but they've taken another approach and argued that picking up an empty car somehow creates some kind of greater duty on behalf of the railroad to do something. Now, when we read plaintiff's brief and their pleadings below, they argue very often that this duty is not anything novel. It's a simple negligence theory. It's something that courts in Illinois have been enforcing for years, and it concerns the situation of a user or manufacturer of a harmful product being responsible for its propensities. The problem here is we weren't a user or manufacturer of the product. What they're trying to hold us liable for is a product that their employer put on the flat surface of the car as the car was removed. We didn't put it there. It's not our product. And also, this argument of negligence also presumes the issue of duty. When we actually get to the actual analysis of duty in this case, both parties agree that we accept the Marshall test. There are four factors. When we look at the first test, we're talking about foreseeability, the foreseeability of injury. Plaintiffs have attempted to say, well, it's obvious that when you're handling asbestos that it's foreseeable that someone can get harmed. That's not the analysis. In this case, the duty that's alleged against us is for moving, moving an empty car with dust on it. It's not whether it's asbestos or not. It's not who we are. They're trying to hold us responsible for the very aspect of movement. The same as a forklift operator operating in the plant. He had all the knowledge that plaintiffs alleged that he should have. Someone coming to check a meter. Virtually everyone that ever walked in that plant would create movement of asbestos fibers on the plant floor and on other flat surfaces, on tables, on desks. It's the movement that they're talking about. And we would argue, based on the Marshall factor, just that alone makes the foreseeability of injury highly unlikely. To foresee injury from simply moving is just not reasonable. But there's much more under the Marshall test that shows duty should not be implied legally in this case. And that's when you get to the two-pronged burden analysis. The consequences of placing the burden on the defendant and the burden itself. And when we look at these two, the burden against guarding against injury, and placing that burden on the defendant, we find it utterly and completely unreasonable to require a transporting railroad to have a duty given those burdens. First of all, as far as the burden of the risk of injury, we're talking about a situation where the railroad just doesn't have to be knowledgeable about asbestos. It doesn't actually have to be knowledgeable about every product they handle. Hundreds of thousands of times a day, any specific railroad is dropping off product people want. If they have knowledge, and if you look in the scientific literature today, pretty much everybody has various knowledge concerning products they at least have in their own workforce. But we haul them all too. To place a burden on us to identify those products, identify how they're being used, and then somehow presuppose that how the employer is using them is improper is too much. You would require the railroad to be an industrial hygienist, and more than the EPA. They'd have to know more than the EPA because they'd have to come and enforce it better than the EPA does, or OSHA. And then when you get to the burden of placing the consequences on the defendant, the mechanics of warning in this case, or these cases, would be impossible. Placing a duty on the transporter to warn the employees of the consignee of the dangerous propensities of product they put on the top of a boxcar is unreasonable. Is there any dispute as to the facts in this case? I don't believe so. I don't believe so. So we're talking about having the railroad not only have someone warn the people that might be there when they drop a car off or when they pick it up, but to recognize the duty in this case requires the railroad to go inside the plant, assess the plant, warn each and every one of the employees in the plant, possibly go and warn their families, and then stake out the plant. In case some new employee gets hired, and the employment here is relatively small, it cannot be the burden of placing that on a transporter railroad is unreasonable. And for these reasons, there should be no duty recognized in this case. We haven't talked about the case law, but when we look at it, we can see there's three cases cited that are particularly instructive. You have the Covey case of a federal court out of Missouri, which makes it quite clear that if the product was actually in the boxcar, that the railroad has absolutely no duty to warn concerning the dangerous nature of a product it holds. That the situation should be different because the consignee threw a chunk on top of an empty car should not carry the day. If you don't have a duty with respect to hauling it and warning about the product, placing a duty to warning about the product they put on your car certainly can't. That's way too tenuous. We're going to talk about Crockett versus Unilaw, which is a case that actually plaintiffs don't attempt to distinguish in their briefs. In a federal court case, applying Georgia law, but in that case it was an empty in which the courts were discussing. It was nitrophenol. It was a car that had been unloaded that still had traces of this dangerous chemical in the car. And the court found there is no duty for the railroad to warn the receiver, the cleaner, of the contents of that car or what was in it before. That was between the consignee and the sender of the car. And then finally we have the Bergman case. In the Bergman case, it's Illinois, it's applying Illinois law, and it's on all fours applying the Marshall Test. In that case, the only difference is that it was a truck. And that the ruling of the court was not only was it unreasonable to place a duty on the transportation company, it constituted fraudulent joinery to even allege it. Now when that was talked in plaintiffs' briefs about, well, Bergman didn't concern the pickup of the car. Well, in trucking, that's part of it. You know, it's not like a railroad where you drop off the car and then a locomotive comes when you call them. In most trucking cases, the truck is there. Many times it's unloaded while you are there. And for the court to decide the case based upon the pleadings on a fraudulent joinery clearly had to consider the fact that that truck left. That the car loaded with silica, that the unloading operations clearly would have put silica all over the place, plus the work inside the plant. No duty with respect to the silica that may have accumulated on that car, on that truck, and no duty at all. In the Bergman case, the same points I think that we've made here in the general discussion, and that is they specifically found that that trucking company could not have anticipated injury. And that to expand that duty to that trucking company would make it an expert or make it required to anticipate injury from every product it holds. And that was the basis for the opinion. And if we look at the absurdity of doing such a thing, you'd have to warn the federal government about delivering nuclear waste. They're experts in handling it. You'd have to warn if someone ordered a tankard of water, you'd have to advise those people, the employees of that tankard, not to drink more than 8 gallons a day. Because they could die. And to put that kind of burden on the railroad is unreasonable. However, even if this court were going to entertain placing a duty on the railroad, the Commerce Clause in our opinion would prevent doing so. When we look at the Commerce Clause in this case, what we know is pursuant to 49.1, section 10, 49.1, section 14, that the federal government, Congress has acted. It has developed a policy with respect to car service. Car service includes the return of cars, empty cars. And that section 14, they've given the authority to the Commerce Commission, now the Service Transportation Board, to enforce those regulations. There's a lot of talk in the briefs about what's interstate commerce and what's not interstate commerce. And all I can say about all that is when you look at all that together, what you know is if the Interstate Commerce Commission wanted to act, as they have before pursuant to this section, concerning car shortages and things of that nature, the Secretary of Commerce could have acted. That's interstate commerce. When he did the 1947 rule, they didn't single out cars sitting in Bloomington, Illinois. It was a national car shortage and interstate commerce applies to all. So once we accept the interstate commerce, the interstate nature of the power of the Interstate Commerce Commission, now the State Service Transportation Board, as well as Congress's activity already in this area, the only issue left is whether or not having individual state regulation would upset the need for uniform rules with respect to car service. There's two cases, particularly on point in the brief. One being the CNW v. Calo, Tal, and Brick. The other one being the Southern Pacific v. Arizona case. The first case was a state law in Iowa concerning a rule saying a railroad had to provide empty cars to somebody. And the court found that that was an unreasonable restriction on commerce. It struck that statute. In fact, I think what the quote was indicated that they could hardly be more at odds with the uniformity contemplated by Congress in making that decision that that statute affecting cars was improper. When we look at the Southern Pacific v. Arizona case, that's the train limit case, they made the same essential ruling that requiring cars to break at the state line or be limited at a state line is an unreasonable restriction on commerce. It acts in contrast to uniformity, and given the purpose of the statute, it's not permitted. Were they talking about the dormant commerce clause, or were they talking about a specific act? I think in the Southern Pacific v. Arizona case, there had been action by Congress. So it would not be a dormant commerce clause situation. It would be a situation where Congress had acted, that there were rules in place, although maybe not specifically as to this, and the state regulation acted in face of those rules, just like our case. We have a situation where the Commerce Commission has the power to regulate car service, including the return of cars. Action by the state in this case would be much more burdensome than the Arizona case. In this case, you would be subject to the rules of 50 different states concerning the warnings to be issued, because you can't move a car on somebody's property and ensure that you're not going to move dust underneath it, on it, or inside it. The only person in a position to do that would be the consignee. So the issue is warning in the commerce clause analysis, and it can't be accomplished. If Illinois says you have to say asbestos is harmful, and Iowa says you have to wear a respirator, and Kentucky says you have to refer to state statute, not only do you have the risk of having 50 different rules, plus various rules of local entities and courts, but you have an incredibly high risk of conflict. Especially because we cannot limit ourselves to asbestos in this case. If there is a duty here, it extends to any kind of hazardous material that you can disturb by moving. So essentially the railroad would be subject to different rules in every state on every product. And if they required marking on cars or specific statements by individuals, no car could move through commerce. No car could cross a state line without someone checking the rules and making sure the right words and the right warnings were on the product. And that's why now Congress has specific rules concerning asbestos. And so for these foregoing reasons, if there are no more questions of the court, I believe that there is no duty in this case. And if there is a duty, it should be preempted by the commerce clause. Thank you. Thank you, Mr. Peters. Mr. Wilder. Jim Wilder again on behalf of plaintiffs. We're asking you to affirm the trial court's decision denying the 2619 motion to dismiss and to answer the question. It's a 308 appeal. It's a limited question. To answer that question that the railroad did have a duty. Now a lot of what Mr. Peters said at the start about, well, transporting into the plant and requiring the railroad to go into a plant and see what was going on and so on, is not what's part of the question here. The question is, after the railroad takes possession of the vehicles, does the railroad have a duty at that point, when it knows there's a hazard, to act to reduce the hazard to those who are in the place where they're going to be subject to the hazard, either by warning them or getting rid of the hazard? I know all of you have had cases, numerous cases, over the years from the Bloomington plant and know some of the facts. But the Bloomington plant was in the railroad yards. It was an old railroad building leased by the railroad to Union Asbestos. And because it was an old railroad building, the cars were in the plant. So when Mr. Peters, who I've known for decades in respect, when he says we have to go into a plant, the railroad went into the plant because that's where the cars were parked when they were unloaded. That was a given in this case. You also have to consider the record that's before you. The railroad filed a motion to dismiss from the 2619. They filed a memorandum in support. They attached no affidavits, no evidence of any sort, just a memorandum. And also did not cite to, and this is in our brief, did not cite to the 1947 Car Shortage Act regulation or a number of regulations that they put in their briefs. And we point out in our opposition that this was never presented to the trial court, all these regulations that now form a good portion of their argument before you. They had a general Illinois Interstate Commerce Commission argument, but they didn't talk anything about car shortages in 1947 or regulations in 1952 or that type of thing. They just filed a memo saying no duty and that the Illinois, the Interstate Commerce Clause would have preempted if there was a duty. In response, we filed a memo in opposition and we attached evidence in support of the allegations of complaint. We attached documents and testimony. And that's what the court had before it at the time it ruled. This is a situation, and at least on a 2619 motion, and I'll be honest, I don't know if it's different on a 308 appeal or what. I've never had a 308 appeal before. But on a 2619 motion, reviews de novo and all inferences are in favor of the non-movement. One such case is Hadley from this district, but there's a host of such cases. You asked if the facts are in dispute. The only facts that were presented to the trial court, only facts, would be those that are contained in our complaint and in the evidence we submitted with our memorandum. The transcripts, the testimony, and some documents reflecting the verbal acknowledge. And what we've alleged was that the railroad, as to this substance, asbestos, had knowledge. They had knowledge because their own employees had gotten sick. That's alleged in the complaint. They had knowledge that the workers were not being told by UNARCO or the consignee. And they had the knowledge that asbestos was dangerous. Now that is accepted as true for purposes of this appeal. But in addition, there's evidence that supports that. One of the documents we attached is the 1935 meeting of the Railroad Physicians and Surgeons in Atlantic City in June 10-11, 1935, where the Committee on Disability reported on the diseases facing railroad physicians and said it's silicosis and asbestosis. And the committee said, here's what needs to be done in 1935. You need to educate all concerned. That was number one. Number two, get rid of the dust. And number three and so on was wet it down and other things. That's 1935 and 1958 at the annual meeting that discussed asbestos and cancer. We attached that in support of our complaint. In response, the railroad attached nothing and did not cite to the regulations. Now as to duty, again, it's alleged this is an instance where the railroad took possession of the vehicle. I'm not suggesting that the railroad shouldn't have hauled the asbestos. It had to. That's part of the conversation. I'm not suggesting they needed to put a label on the outside of the car when they were hauling in the plant. That would interfere with the conversation. But after it was emptied, we've alleged, and we've got evidence in support, because we also attached evidence from workers at that plant, that when you moved the car, when they hooked onto it inside the plant, the railroad hooked onto it to move it out, when you did that, dust was created. Because there was dust from the empty 1200 bags of raw asbestos, some of which are broken, others are broken in the process. There's dust inside the car, dust on the outside of the car. It's not a matter of breaking the seal on the railroad's part. It's already been opened and emptied and it's at the destination. And the railroad knows asbestos can be dangerous. That's what we've alleged and supported evidence to that fact. And what the railroad does is come into the plant, hook onto it, and pull it out without saying anything to anybody around it, or attempting to clean it up when it's in their possession, because that's an uncertified question. After they take possession, whether or not they needed to do something to prevent the movement of asbestos fibers accumulated on the boxcars from plant operations or warn such employees prior to moving the boxcars, after the railroad had taken possession of the boxcars. Now, in terms of the Marshall analysis, and again, you need to look at the briefs, but we've heard more of the Marshall analysis to date than the railroad has in their brief. As far as foreseeability, it's foreseeable as to this product. Is it foreseeable as to every product they haul? I don't know, but we put in evidence that it was foreseeable to the railroad as to this product going back to the 35 meeting, going back to the 58 meeting, that it was foreseeable that asbestos could cause disease, as well as the allegations that they also knew because workers... That sort of sounds like the argument, the crash-proof cars argument. If you're a manufacturer of automobiles, you know people are going to get killed in automobiles. Does that mean the automobile manufacturer has a duty to somehow prevent any deaths? I think it's a balancing on the foreseeability. No, not to prevent any deaths, but if you're Ford and you know that penal gas tanks blow up, because you've had some blow up, you probably need to take some action if you realize it's a penal gas tank in terms of doing something about it. I'm not trying to be... I mean the fact that electricity, the electric companies know that people are going to be electrocuted. Does that mean they shouldn't be making electricity? No, but they should try to reduce the risk to the people or let them know, hey, don't touch that live wire, which is what our allegations are, especially if the electricity company knows it's a live wire right there and sees somebody getting ready to touch it or if the electricity company is going to do something to expose that person to the hazard, which is what we've alleged and what I suggest. If you talk about the magnitude of the burden and the consequences, aren't we going to shut down the railroads if we impose a duty on them to not haul hazardous materials? No, I think they, again, they had to haul the asbestos. They had to haul the asbestos. They did not have to tell anybody anything about the asbestos they hauled into the plant. I don't think they can put a label on the car when it goes in, because that's all interstate commerce. But when they go in and pick it up and they're going to take possession of the car, it's become their product, if you will, then. And they know there's a danger, and that's what we've alleged. They know there's a danger and do nothing, and I suggest that is a duty that has been recognized when by their actions they contribute, because by their actions of moving the car, they cause dust to be released. So they contribute. This isn't a situation where they saw something. They may have seen asbestos dust over underneath the machines in the plant when they went in to pick up, not saying they should have warned about, hey, there's asbestos under the pipe-covering machines, but when they know they're going to take action that's going to expose people to asbestos fibers, which is what we're alleging, then they have a duty.  if you accept the railroad's argument, then if the railroad engineers go into that plant to hook up the three cars that are sitting there empty, and they see that some disgruntled employees put a bomb on the first one, and when it moves it's going to go off, then what the engineer would do under the railroad's argument is say, well, my locomotive is pretty well built here, I think I'll be okay up here, and I'm not going to say anything to anybody else when I hook up and pull out and let the bomb go off. Asbestos isn't a bomb, it's not an immediate bomb, but it causes disease, and we say the railroad knew that. So I think it was foreseeable on this record, in fact, I don't think the railroad in its briefs says, it's not foreseeable, it's not foreseeable. I think actually on this record it's undisputed that there is evidence of foreseeability on the part of the railroad as to this substance, as well as the fact that it's going to create dust when their own actions contribute to the dust in the plant. Does the Bergman case help you? It doesn't particularly help me. I don't think it hurts me because of this. In Bergman, they said that the trucking company was a peripheral defendant and it wasn't reasonable for the trucking company to anticipate that silicon could cause disease. Here we've said the railroad had actual knowledge that what they were going to do was going to expose people. That's different from the trucking company. And they had actual knowledge for decades before they took the actions that exposed people. I'm not saying they need to tell the employees that UNARCO is exposing you to asbestos in this plant and not telling you. I'm saying when they take possession of an object, it happens to be a railroad car, and they know, based on allegations and the evidence in this record, that what they're going to do is going to expose people to a danger that they have a duty to tell, whether it's a bomb, whether it's a railroad car that had its own gas tank, or whether it's asbestos. And that's what the record is in this case, and that's how I would suggest it's different. That's how it's different, Justice McCullough, than the Bergman case, I think. Because Bergman, that judge found, there was no evidence that it was reasonably foreseeable that the trucking company would know about the hazards. There may be products it's not foreseeable that the Illinois Central would know about, but asbestos was one they would know about. Asbestos was one they knew was being used in the asbestos plant because they leased it to the plant. This isn't a premises liability case, but that goes to knowledge. And they knew asbestos was dangerous, and they knew that by moving those cars with dust on them, they were creating a danger because they were contributing to the dust in the environment that people breathe. As far as the likelihood, that goes back to their own workers. They knew, we've alleged, and we've supplied the documents, that by 1935 the railroad industry, the railroad physicians and surgeons, were saying educate all concerned and get rid of the dust. The magnitude, Tom did, Mr. Peters did a good job sort of going to the extreme, which is what you sometimes want to do in appellate arguments, saying, well, the forklift operator, the guy that reads the meter, and all the rest, that's movement. That's true, but he's not in possession of a product. If the water meter reader comes in there, and he's got something dangerous that he's in possession of, and by doing that he exposes the people around him to danger, I'd say he'd have a duty either to not do that, or to tell them, hey, this water meter thing I'm going to use here is going to give off radiation or whatever. Step away. And so that's a difference. As far as the... So really this isn't novel. It's not novel in this case. Mr. Peters started off by saying that this could affect other cases. There are other cases of pendant. I mean, this theory against this defendant was first filed in 1993, as I recall, for 18 years or more than that, whatever. But 18 years it's been going on in terms of cases. And their response has always been that, well, there's no duty and it's a commerce clause. Going to the interstate commerce clause... Have any of those cases been resolved against the railroad? Most of them have, and they've got a chart they filed with the Illinois Supreme Court. Most of them have been resolved by settlement. Some of them have been resolved by breaks for the railroad. Any appellate decisions? No. When we lost by we, either my present firm, I think we've had one, or in the firm I was with previously, we lost as to the railroad, but won as to the asbestos manufacturers who were co-defendants. And the asbestos manufacturers in Van Winkle, as an example, Owens-Cornyn appealed the judgment against it. We did not appeal the loss as to the railroad, but tried to preserve the judgment we had against Owens-Cornyn. In every case where they had gotten, they're not guilty if we've won against one or more of the other defendants. When I say every case, it's not like it's 15 or something. There's probably four or five like that, and there's probably been 75. If the appellate court ever said there was a duty in a case like this, would that answer the question from then on? Every case afterward, you'd say race judicata? There's a duty? If it became final and the Supreme Court did not take it, I would say in the circumstances, assuming they're sufficiently similar to what's before you, yeah, that's guidance that there's been a duty found and that the trial courts have been getting it right since then. Because it would be a final judgment against the railroad, who was not just a privity, but was a defendant. It would be on the same theory. And if this is an anarchic plant case only, it would be the same set of facts, basically, because the foreseeability issue would not be an issue that would differ from case to case on cost of exposure, because the foreseeability as a railroad was back to the 30s, and then it was planned to open to the 51. As to the commerce, interstate commerce, we first say it's not invoked, because it doesn't apply here. And one of the cases, PIPAL, P-I-P-A-L, Supreme Court case, is a case that says there's an exception to the general rule is when the car is at the destination. It's not part of commerce anymore. PIPAL was an exception, it said, because in PIPAL, as I understand it, the car was going from point A to point B, and they knew they were stopping along the way to take out some railroad tugs. So when they stopped, it was still, they said, in interstate commerce, unlike the usual general rule, which is when you're at the designation, you're not in interstate commerce. These cars were at their destination. These cars were at their destination when the railroad comes in and takes possession of them. The railroad, in its reply brief, tries to say, well, they must have been going somewhere. They were in our railroad yards, and we took possession of the building, but they had to go back somewhere to some other state or something. There's no evidence one way or the other at that point. They had the opportunity to submit whatever they wanted. Now, logic would tell you... Well, the state would tell them there's not a parking lot of railroad cars. No, logic would tell you they got to go somewhere sometime, but the idea that when you hook on at the destination and create a danger at the destination, because we're not alleging these people got exposed or got sick because the railroad cars were, you know, in North Normal on their way to wherever, Canada, and giving off dust then. We're saying they came in at the destination, hooked on, knowing there was a danger, knowing, not should have, but knowing, and contributed by their own act to the asbestos being released that exposed the people. Another issue as to the issue of the interstate commerce claim is, again, as I referenced earlier, and it's in our opposition brief, they've cited, and Mr. Peters cited today, all these regulations from 47 and so on. None of this ever was in the trial court level. And I would suggest, as a result, there's a waiver in regard to that because the trial court never had an opportunity to look at it. Their reply brief is, we're just expanding on our argument when we start citing specific cases. Oh, Rule 308, they're asking us to make the call, right? On duty. Well, that's what, if they're asking you independently of anything the trial court did, then I guess we all should have been supplying more exhibits and more, I mean, to me, regulations are something different than citing an additional case that supports it when you start citing for the first time at the federal level regulations that were never at the trial court record. And I'll be honest, Justice Cook, I don't know what that means. It's my only 308. If that's the case, then on the next one, I'll say, okay, it's a brand new crack at the record and all new evidence. And if that's how 308s are, then I probably should have filed more stuff in response to it. But it wasn't at the trial record, these rules and regulations that are cited to you now. Maybe waiver rules don't apply in 308. I honestly don't know. When I finish, Mr. Peters has a chance to address you again. And being skilled, he'll again try to suggest to you, well, there's just such a consequence, the consequences of putting the burden on the railroad, it will shut down commerce. I mean, the railroad system won't operate. You're not here, I would suggest, even in this 308 situation to determine whether a railroad should warn about every product that it hauls. Actually, the answer to that is no, they shouldn't. They don't have to warn about what they haul. What this appeal is limited to is when there's something they know is hazardous and they know that they're going to act in a way to present a hazard to the people, whether it be the bomb, whether it be the slow-acting asbestos, whether they have to say something before they take the action that releases the asbestos into the air where these people breathe it and it contributes to their illness the same way the asbestos released in the Thacker case, all of the asbestos was in the environment and contributed to the illness. So we're asking you to answer the question, yeah, there is a duty here, and it's not preempted by the Congress laws. If there's no questions, I'll finish. Don't appear to be any. Thank you. Mr. Peters. Let me deal with the last issue first. I'm not going to tell you the Congress will be shut down and the railroad will be shut down based on this Court's order because today you can't do this. Today there's been federal action and there's no duty upon the railroad to do anything further than what's provided for in the regulations. You will shut it down in 1950 and 1960. There's no question about that. And this idea that this knowledge from 1935 somehow makes this case different from some other product carries no weight. When you look at the documents that are actually attached, did the railroad discuss asbestos and its operations? Yes. Did they have rules concerning the handling of asbestos in their operations? Yes. Even after all those rules, did they still use asbestos in their operations for at least another 25 years? I mean, they knew asbestos was dangerous, but that doesn't mean that it's dangerous in every single instance. And that's what Planoff wants us to do in this case. He leaps from this bit of knowledge here and then says we have knowledge of everything. Now, to the extent that even it's important from a duty analysis, whether it's a duty analysis to start with, is somewhat questionable. But you can't make the leap that we knew every specific aspect on the handling of asbestos to presume that anybody in 1950 or 1961 thought that moving inside of an asbestos plant was dangerous is not supported by any common-sense theory of what's going on in our world. It's just wrong. My recollection is in your opening argument you said the railroad never did anything here that harmed any of these people. But Mr. Wilder says, you know, it was the railroad moving the cars out of the plant after they'd been unloaded that was spreading the asbestos. Well, that's an issue that's unknown. When I said that moving the cars never harmed anybody, I misspoke. We don't, at this point in the stage of proceedings, we don't know whether that's true or not. Under the Marshall Test, that's one thing that's actually considered, that's the second prong, called the likelihood of injury. You know, judges don't make a duty call at the beginning of the case. They hear the evidence. If there's an evidentiary dispute, don't we have to hear the evidence? I think you presume the evidence in this case, the way it's listed by plaintiff, then there's no duty. Based on undisputed evidence. If you assume that by moving, and I'm more than willing to do this for the purpose of the appeal, if you assume that by moving the cars, some dust re-entrained in the atmosphere and settled sometime later, you can assume that, that still, in doing the duty analysis, doesn't place foreseeability on us, does nothing with burden, and can only go to the issue of the likelihood of injury. And then, under the facts of this case, you have to look at the big picture and say, under the likelihood of this injury, what defendant would have anticipated the likelihood of injury from moving a flat surface car? There's no dispute that you knew that asbestos was injurious. There's no dispute from the pleadings that plaintiff attached that we discussed asbestos and potential harms of asbestosis in the 30s and that in the 50s, we recognized that asbestos, when used in a particular way, could cause lung cancer. If your employees had contracted asbestosis, you would be liable, would you not? Absolutely, Your Honor. Why aren't you liable to other employees, employees of others, when it's your movement of the cars that caused the asbestosis? The short answer is because I have no duty to these particular employees. And the reason why I have no duty is because of the martial analysis. To place on a transporter the duty of warning people about disturbing the material they put on top of your car when they're using it in their plant and they asked for it is unreasonable. And that's why we claim there's no duty in this case. We talked a little bit about waiver. We said the case, the arguments were raised. Waiver is not an issue based on the Browning case. I gave the bomb analogy. I think that's a perfect analogy for what we're talking about here. When I talked to you about the Covey case, we talked about the situation, what the duty is, the defining duty, it's the inherent probability or possibility of the product you're hauling to cause disease. We're not hauling a bomb. Now, if we were actually contracted by somebody to haul bombs to a factory, does anybody think we'd have a duty to warn them that those bombs might go off if you handle them inappropriately? No. What Plaintiff is talking about is the intervening act of a third party. And that duty analysis is completely different than the duty we're doing here. We're talking about a legal product hauled legally, in fact, required to haul, used legally by the people who used it. Is the red light on? Pardon me? Is the red light on? It is. Time is up. Thank you. Thank you. All right, we'll stand in recess.